## LANGDEAU *v.* HANES.

The State of Virginia, which, prior to the Revolution, asserted title to the Northwest Territory, always respected the possessions and titles of the French and Canadian inhabitants who had declared themselves her citizens; and when she ceded the Territory to the United States in 1783, she stipulated by the express terms of her grant for their confirmation; and the United States, in 1784, in accepting the grant with this provision, bound themselves to perform the stipulation.

The duty of the United States under the cession and acceptance and by the principles of public law, was to give to such inhabitants such further assurance as would enable them to enjoy undisturbed possession and to assert their rights judicially to their property, as completely as if their titles were derived from the United States.

The United States confirmed, or provided for the confirmation of these existing rights by resolutions and acts of Congress, in 1788, 1804, and 1807. The patents which the act of 1807 authorized did not convey the title.

In the legislation of Congress a patent has a double operation. It is a conveyance by the government when the government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation.

A legislative confirmation of a claim to land is a recognition of the validity of such claim, and operates as effectually as a grant or quit-claim from the government. If the claim be to land with defined boundaries, or capable of identification, the legislative confirmation perfects the title to the particular tract, and a subsequent patent is only documentary evidence of that title. If the claim be to quantity, and not to a specific tract capable of identification, a segregation by survey will be required, and the confirmation will then immediately attach the title to the land segregated.

ERROR to the Circuit Court for the Southern District of Illinois; the case being thus:

Langdeau brought ejectment, August, 1872, against Hanes for a piece of ground, which before our Revolution was part of the French and Canadian settlement of St. Vincents (now Vincennes), and; as such, part of the Northwestern Territory conveyed in 1783, by authority of the State of Virginia, who then claimed it, to the United States, under an express stipulation—

" That the French and Canadian inhabitants and other set-

tlers of . . . St. Vincents, and the neighboring villages, who have professed themselves citizens of Virginia, shall have their possessions and titles *confirmed* to them, and be protected in the enjoyment of their rights and liberties."

This stipulation was embodied in the deed of cession, and the deed, in the form in which it was subsequently executed, was incorporated into the resolutions of Congress of 1784, declaring their readiness to accept the deed.*

By act of March 26th, 1804,† Congress appointed commissioners to hear and determine all claims for land held by settlers under the French; and under this act the claim of the heirs of one Jean Baptiste Tongas, under a grant to their ancestor for two hundred and four acres, came up and was confirmed.‡ The commissioners made report of the titles which they had confirmed, and Congress, on the 3d of March, 1807, by "An act *confirming* claims to land in the District of Vincennes,"§ enacted:

"SECTION 1. That all the decisions made by the commissioners appointed for the purpose of examining claims of persons claiming lands in the District of Vincennes, in favor of such claimants . . . be, and the same are, hereby confirmed.

"SECTION 5. That every person or the legal representative of every person, whose claim to a tract of land is confirmed by this act, and who had not previously obtained a patent for the same . . . shall, *whenever his claim shall have been located and surveyed*, be entitled to receive from the register of the land office at Vincennes, a certificate stating that the claimant is entitled to *receive a patent for such tract of land* by virtue of this act, . . . which certificate shall entitle the party to a patent for the said tract, which shall issue in like manner as provided by law for the other lands of the United States."

A survey of the tract was made in 1820, but no patent issued until 1872, when one issued reciting the "*confirmation*" by the act of 1807 of the report of the commissioners

---

\* See Journals of Congress, vol. i, pp. 66–72.

† 2 Stat. at Large, 277.

‡ American State Papers, 573 ; Supplement to Document D.

§ 2 Stat. at Large, 446.

appointed under the act of 1804. The patent purports to "give and grant" to the heirs of Tongas, in fee, the tract in question. The plaintiff claimed under these heirs.

The defendant claimed as tenant under one Law, who for more than thirty years had been in the actual possession of the premises, under claim and color of title made in good faith, having purchased the same at a sale under a decree of foreclosure made by the Circuit Court of Illinois for Lawrence County, and received the deed of the commissioners appointed by the court to make the sale, and had paid all the taxes thereon during that time.

By the law of Illinois such a possession constitutes a bar to any adverse claim.

The court held, as matter of law, under the foregoing facts:

"1st. That the act of confirmation of 1807 was a present grant, becoming so far operative and complete, to convey the legal title when the land was located and surveyed by the United States in 1820, as that an action of ejectment could be maintained on the same.

"2d. That the patent was not of itself the grant of the land by the United States, but only the evidence that a grant had been made to the heirs of Jean Baptiste Tongas.

"3d. That as Law went into the possession of the land under claim and color of title made in good faith, and had held possession for more than seven successive years, and during that time had paid all the taxes legally assessed upon the land before the commencement of this suit, it was a bar to a recovery by the plaintiff."

To each of these propositions of law the plaintiff excepted, and judgment having been given against him, he brought the case here.

*Messrs. John Hallum and W. B. Thompson, for the plaintiff in error:*

The question is, did the confirmatory act of 1807 pass the equitable title to the confirmee, or did it pass a legal title to the fee? The court below held that it passed the latter. Now

we assert that the legal title remained in the United States until the patent issued for the land. If this is so the statute of limitations prescribed by Illinois is no bar.

The cases of *Bagnell* v. *Broderick*,[*] *Fenn* v. *Holme*,[†] *Gibson* v. *Chouteau*,[‡] control the case. The last is in point. This court there held that the power of Congress in the disposal of the public domain cannot be interfered with or its exercise embarrassed by any State legislation; that such hostile legislation cannot deprive the grantees of the United States of the possession and enjoyment of the property by reason of any delay in the transfer of the title after the initiation of proceedings for its acquisition from the United States.

That the patent is the instrument which under the laws of Congress passes the title of the United States; that in the action of ejectment in the Federal courts for lands derived from the United States, the patent, when regular on its face, is conclusive evidence of title in the patentee.

That in actions of ejectment in the State courts, when the question presented is, whether the plaintiff or defendant has the superior title from the United States, the patent is conclusive.

That the occupation of lands derived from the United States before the issue of their patent, for the period prescribed by the statute of limitations of a State for the commencement of actions for the recovery of real property, is not a bar to an action of ejectment for the recovery of such lands founded on the legal title subsequently conveyed by the patent.

That such occupation does not constitute a sufficient equity in favor of the occupant to control the legal title thus subsequently conveyed, whether asserted in a separate suit in a Federal court, or set up as an equitable defence to an action of ejectment in a State court.

*Mr. W. E. Niblack, contra:*

*Chouteau* v. *Gibson* is not parallel to this case, and does

---

[*] 13 Peters, 436.      [†] 21 Howard, 481.      [‡] 13 Wallace, 92.

not apply. There the land in dispute was a tract selected by certain parties in lieu of land damaged by earthquakes at New Madrid in the year 1812, in which way the lands held by early inhabitants of New Madrid were in that year materially injured. Congress, in 1815, by way of relief, allowed them or their assigns to locate an equal quantity of land to that injured, on *the domain of the United States*, and it was such a relocation or new location of land near St. Louis, which was in controversy in that case. Of course the title or legal estate to the land thus located in place of that injured was solely in the United States, and from them alone could any title be derived, and until the conditions under which the relocation was to be made were complied with, the United States retained the title. It was accordingly held that as against the title conveyed by their subsequent patent, the statute of limitations of Missouri could only begin to run after the patent was issued,—not previously, that is, whilst the United States held it, which would seem to be obvious enough.

In the present case neither Virginia nor the United States ever owned the land in controversy, or pretended to own it. The act of cession and all the acts of Congress are acts of confirmation of a previously existing claim and right. Besides, if this were otherwise, and the claim of the heirs of Tongas were a mere equitable title, the legislative confirmation by the act of 1807 operated as a grant or quit-claim of the government, perfecting the claimant's title; and the statute of Illinois would begin to run against them *after* the title was thus perfected. Had there been a legislative confirmation of the claim under the New Madrid location, in *Gibson* v. *Chouteau*, there would have been no occasion for the patent of the United States to perfect the claimant's title. The statute of limitations would have commenced running, in that event, from the date of the confirmation.

Mr. Justice FIELD delivered the opinion of the court.

Although the territory lying north of the Ohio River and west of the Alleghanies, and extending to the Mississippi,

was claimed by Virginia previous to 1776 to be within her chartered limits, it was not reduced to her possession until the war of the Revolution. Previous to that period numerous settlements had been formed within that portion which at present comprises the States of Indiana and Illinois, consisting principally of French inhabitants from Canada, who held the lands they occupied under concessions from French and English authorities. The possessions and titles of these people were respected by Virginia, and in her cession of the territory to the United States she expressly stipulated for their confirmation. The act of her legislature, passed on the 20th of October, 1783, authorized her delegates in Congress to execute a deed transferring her right, title, and claim, as well of soil as of jurisdiction, to the territory, provided that the transfer should be subject to various conditions, and, among others, to this one: "That the French and Canadian inhabitants and other settlers of the Kaskaskias, St. Vincents, and the neighboring villages, who have professed themselves citizens of Virginia, shall have their possessions and titles confirmed to them, and be protected in the enjoyment of their rights and liberties." The deed executed by the delegates embodied the act of Virginia, and its acceptance by the United States imposed upon them the duty of performing the condition and giving the protection stipulated. That duty was to confirm the possessions and titles of the inhabitants, and to confirm was to give to them such further assurance as would enable them to enjoy undisturbed their possessions, and assert their right to their property in the courts of the country as fully and completely as if their titles were derived directly from the United States. Such further assurance might have been given by any act of the new government recognizing the existence of the original possession and defining its limits, which the claimants could use as evidence of their title under the cession. It might have been by a certificate of survey, or by a patent of the government, or by direct legislation. The mode in which the obligation assumed by the United States should be discharged was a matter resting in the discretion of Congress.

It was for confirmation of existing possessions and titles that the deed of cession stipulated, not the transfer of any new title.   Virginia had not repudiated the concessions made by the French and English authorities to the inhabitants in the territory who had declared themselves her citizens, but had recognized and sustained them.   There was, therefore, no title in her in the lands covered by the possessions of these people to transfer, and she did not undertake to transfer any.   Her language was, that she conveyed " all right, title, and claim, as well of soil as of jurisdiction," which the commonwealth had to the territory.   In this respect she recognized the general rule of public law, that by the cession of territory from one state to another public property and sovereignty alone pass, and that private property is not affected.   Even in cases of conquest, as Mr. Chief Justice Marshall observes in *United States* v. *Percheman,** it is unusual for the conqueror to do more than to displace the sovereign and assume dominion over the country, and the sense of justice and right, which is felt by the whole civilized world, would be outraged if private property should be generally confiscated and private rights annulled.   " The people," continues the Chief Justice, " change their allegiance; their relation to their ancient sovereign is dissolved, but their relations to each other and their rights of property remain undisturbed.   If this be the modern rule, even in cases of conquest, who can doubt its application to the case of an amicable cession of territory?   Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change.   It would have remained the same as under the ancient sovereign."

The United States took, therefore, the territory ceded by Virginia, bound by the established principles of public law to respect and protect all private rights of property of the inhabitants of the country, and bound by express stipulation

---

* 7 Peters, 51, 87.

to confirm the possessions and titles of the French and Canadian inhabitants and other settlers mentioned in the deed of cession who had professed themselves citizens of Virginia.

By resolutions passed by Congress under the Confederation, in June and August, 1788, measures were authorized for the confirmation of these possessions and titles, and in supposed compliance with the authority conferred upon the governor of the Territory, numerous confirmations were made by him, which have been sometimes designated in the subsequent legislation of Congress as grants by that officer.* But no system of measures was adopted for a general confirmation until the passage of the act of Congress of March 26th, 1804.†

By that act every person claiming lands within certain designated limits in the territory north of the Ohio and east of the Mississippi, by virtue of a legal grant made by the French government prior to the treaty of Paris of the 10th of February, 1763, or by the British government subsequent to that period, and prior to the treaty of peace between the United States and Great Britain, on the 3d of September, 1783, or by virtue of any resolution or act of Congress subsequent to that treaty, was required to deliver, on or before the 1st of January, 1805, to the register of the land office of the district within which the land was situated, a notice stating the nature and extent of his claim, together with a plat of the tract or tracts claimed, and at the same time, for the purpose of being recorded, "every grant, order of survey, deed, conveyance, or other written evidence of his claim." And the register of the land office and the receiver of public moneys were constituted commissioners within their respective districts for the purpose of examining the claims thus presented. It was made their duty to hear in a summary manner all matters respecting such claims, to examine witnesses and such testimony as might be adduced

---

* Laws of the United States, vol. i, p. 580; Doe ex dem Moore and others, *v.* Hill, Breese, 236, 244; Reichart *v.* Felps, 33 Illinois, 434.

† An act entitled An act making provision for the disposal of the public lands in the Indiana Territory, and for other purposes, 2 Stat. at Large, 277.

before them and to decide thereon " according to justice and equity;" and to transmit to the Secretary of the Treasury a transcript of their decisions made in favor of the claimants, and a report of the claims rejected, with a substance of the evidence adduced in their support. This transcript of decisions and the report, the secretary was required to lay before Congress at its next ensuing session.

Among the claims presented under this act was one on behalf of the heirs of Jean Baptiste Tongas for two hundred and four acres, situated in the neighborhood of Vincennes, a place which is designated in the cession from Virginia as St. Vincents, such claim being founded upon an ancient grant to their ancestor. The commissioners decided in favor of the heirs and confirmed their claim, and transmitted a transcript of their decision to the Secretary of the Treasury, by whom it was laid before Congress.

By the act of March 3d, 1807,* this decision, and all other decisions in favor of persons claiming lands in the district of Vincennes, contained in the transcript transmitted to the Secretary of the Treasury, were confirmed. This confirmation was the fulfilment of the condition stipulated in the deed of cession so far as the claimants were concerned. It was an authoritative recognition by record of the ancient possession and title of their ancestor, and gave to them such assurance of the validity of that possession and title as would be always respected by the courts of the country. The subsequent clause of the act providing for the issue of a patent to the claimants, when their claim was located and surveyed, took nothing from the force of the confirmation.

In the legislation of Congress a patent has a double operation. It is a conveyance by the government when the government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation.

---

* An act confirming claims to land in the district of Vincennes, and for other purposes, 2 Stat. at Large, 446.

The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer from the government.

In the present case the patent would have been of great value to the claimants as record evidence of the ancient possession and title of their ancestor and of the recognition and confirmation by the United States, and would have obviated in any controversies at law respecting the land the necessity of other proof, and would thus have been to them an instrument of quiet and security. But it would have added nothing to the force of the confirmation. The survey required for the patent was only to secure certainty of description in the instrument, and to inform the government of the quantity reserved to private parties from the domain ceded by Virginia.

The whole error of the plaintiff arises from his theory that the fee to the land in controversy passed to the United States by the cession from Virginia, and that a patent was essential to its transfer to the claimants, whereas, with respect to the lands covered by the possessions of the inhabitants and settlers mentioned in the deed of cession, the fee never passed to the United States; and if it had passed, and a mere equitable title had remained in the claimants after the cession, the confirmation by the act of 1807 would have operated as a release to them of the interest of the United States. A legislative confirmation of a claim to land is a recognition of the validity of such claim, and operates as effectually as a grant or quit-claim from the government. "A confirmation," says Sheppard in his Touchstone of Common Assurances, "is the conveyance of an estate, or right, that one hath in or unto lands or tenements, to another that hath the possession thereof, or some estate therein, whereby a voidable estate is made sure and unavoidable, or whereby a particular estate is increased and enlarged."* If the claim be to land with defined boundaries, or capable of identification, the legislative confirmation perfects the title

* Page 811.

to the particular tract, and a subsequent patent is only documentary evidence of that title. If the claim be to quantity, and not to a specific tract capable of identification, a segregation by survey will be required, and the confirmation will then immediately attach the title to the land segregated.

We do not understand that the ancient grant to Tongas was only of quantity, but understand that it was of a specific tract of two hundred and four acres, and that the decision of the commissioners in favor of the claimants had reference to a defined tract. If such were the fact the title of the heirs was perfected, assuming that previously they had only an equitable interest, upon the passage of the confirmatory act of 1807; if, however, the grant was of a certain quantity of land then undefined and incapable of identification, the title became perfect when the quantity was segregated by the survey made in 1820.*

The plaintiff can, therefore, derive no aid from the patent issued in 1872. The doctrine which his counsel invokes, that the legislation of a State cannot defeat or impair the rights conferred by a patent of the United States in advance of its issue, is sound when properly applied, but it has no application here. There is no analogy between this case and the case of *Gibson* v. *Chouteau*,† and other cases cited by him. Here, in any view that may be taken, the title was perfected in the heirs of Tongas more than half a century before the patent issued, and for more than thirty years of that period the landlord of the defendant has been in the actual possession of the premises under claim and color of title made in good faith, and has during that time paid all the taxes legally assessed thereon. His possession has, therefore, ripened into a title, which, under the statute of Illinois, is a bar to any adverse claim.    JUDGMENT AFFIRMED.

---

* Rutherford *v.* Greene's Heirs, 2 Wheaton, 196.
† 13 Wallace, 93.