# McNEE *v.* DONAHUE.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 121. Argued and submitted December 14, 1891. — Decided January 11, 1892.

In ejectment plaintiff claimed title to certain parcels of land by purchase from the State of California under its selection of lands as part of the Agricultural College grant from Congress of July 2, 1862, 12 Stat. 503, c. 130; certification thereof by the United States Land Department thereunder; and subsequent patent from the State to him. Defendant claimed legal title by a prior purchase from the State under prior state selections, [1] by purchase and location of state land warrants issued by the State under the grant of 500,000 acres made to it by section eight of act of September 4, 1841, 5 Stat. 453, c. 16, and [2] by purchase of indemnity land, selected in lieu of school sections sixteen and thirty-six, granted by the act of Congress of March 3, 1853, 10 Stat. 244, c. 145, and lost by inclusion within Mexican grants subsequently confirmed; further claiming that both selections were confirmed by the first section of the Act of Congress of July 23, 1866, 14 Stat. 218, c. 219, passed before the selection, certification and patenting under which plaintiff claims. *Held,*

(1) That the first section of the act of July 23, 1866, must be construed in connection with section two of that act, and, as thus construed, it did not confirm the selections under the 500,000 acre grant, those selections not having been made of lands previously surveyed by authority of the United States: but said section, thus construed, did confirm the lands selected in lieu of the school sections taken by the Mexican grants, such selected lands having been previously surveyed by authority of the United States, and notice of such selection having been given to the register of the local land office, and the lands having been sold to a *bona fide* purchaser, in good faith, under the laws of the State;

(2) That confirmation to the State of its title enured to the benefit of its grantee without any further action by the land department or by the State.

A legislative confirmation of a claim to land with defined boundaries, or capable of identification, perfects the title of the claimant to the tract, and a subsequent patent is only documentary evidence of that title.

No title to lands under the Agricultural College grant of 1862, under which plaintiff claims, vested in the State until their selection and listing to the State, which was subsequent to the time at which the title of the United States passed to the defendant.

No trust was created by such grant which prevented land subject to selection thereunder from being taken under prior selections in satisfaction

of other grants. No trust could arise against the State thereunder until its receipt of all or a portion of the proceeds arising from the sale of the property, and no disposition of such proceeds could affect the title acquired by other parties, from the sale of such lands thereunder.

Defendant having, after his general denial of the allegations of the complaint, for a further separate answer and defence, set up his claim of title to demanded premises by cross-complaint, and prayed affirmative relief thereon by cancellation of the State's patent to the plaintiff, or by charging him as trustee of the title and compelling him to convey the premises to the defendant, such a mode of setting up an equitable de-- fence to an action for the possession of land being allowable under the system of civil procedure prevailing in California, the judgment of the Supreme Court of that State, declaring such trust. and directing such conveyance, is affirmed.

THE court stated the case as follows:

This is an action for the possession of certain parcels of land in the county of Santa Clara, California, embracing one hundred and six acres and a fraction of an acre, and constituting, according to the United States survey lots one (1) and two (2), of section twenty-six (26), township six (6) south, range one (1) west, Mount Diablo meridian. It was brought in the Superior Court of that county. The plaintiff, in his complaint, alleges ownership of the lands and right of possession on the 16th of June, 1882, and ever afterwards; the wrongful and unlawful entry thereon, on that day, by the defendant, and his exclusion of the plaintiff therefrom, to the latter's damage of five thousand dollars; and that the value of their use and occupation is two thousand dollars a year. He therefore prays judgment for their possession, for the damages sustained, and for the value of their use and occupation until final judgment.

The defendant, in his answer, denies the material allegations of the complaint, and then, as a separate defence, by way of a cross-complaint, sets up various matters upon which he claims to have acquired the equitable title of the premises, and prays that a patent of the State for them to the plaintiff, and upon which he relies for a recovery in this case, may be adjudged null and void, or, that he hold the legal title under it in trust for the defendant, and be decreed to convey the premises to him.

The plaintiff answered the cross-complaint, and the case was tried by the court without the intervention of a jury. After finding the facts, it held, as a conclusion of law, that the defendant was entitled to a judgment; that the plaintiff take nothing by his action; that the defendant was entitled at the commencement of the action, and was still entitled, to the possession of the premises, and was their equitable owner; and that the plaintiff holds the legal title, under a patent by the State of California, bearing date June 18, 1882, in trust for the defendant, and should execute and deliver a conveyance of the premises to him. Judgment in conformity with this conclusion was accordingly entered. On appeal to the Supreme Court of the State it was affirmed, and the case is brought to this court, on writ of error, by the plaintiff.

*Mr. S. F. Leib* for plaintiff in error.

*Mr. Philip G. Galpin* and *Mr. Wilbur G. Zeigler* for defendant in error submitted on their brief.

Mr. Justice Field delivered the opinion of the court.

Under the system of procedure in civil cases which obtains in California an equitable defence as well as a legal defence may be set up to an action for the possession of land. It is required in such case that the grounds of equitable defence be stated separately from the defence at law. The answer, to that extent, is in the nature of a cross-complaint, and must contain, substantially, the allegations of a bill in equity. It must set forth a case which would justify a decree adjudging that the title held by the plaintiff should be conveyed to the defendant, or that his action for the possession of the premises should be enjoined. Wherever the two defences are presented in this way, the equitable one should, as a general rule, be disposed of before the legal remedy is considered. Its disposition may, and generally will, render unnecessary any further proceeding with the action at law. *Gibson* v. *Chouteau,* 13 Wall. 92, 103; *Quinby* v. *Conlan,* 104 U. S. 420; *Estrada* v. *Murphy,* 19 California, 248, 273.

The controversy in this case involves a consideration of different acts of Congress granting lands to the State of California. The question to be determined is to which of the parties the title of the United States passed. The plaintiff claims title under a grant made by the act of Congress of July 2, 1862, 12 Stat. 503, c. 130, "donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts," and amendatory and supplementary acts, contending that the premises in controversy were selected as part of such lands apportioned to the State of California and patented by the State to him.

The defendant claims title to the premises from two sources; one, from the eighth section of the act of Congress of September 4, 1841, 5 Stat. 453, c. 16, granting five hundred thousand acres of lands for purposes of internal improvement, to each new State upon her admission into the Union, alleging that the parcels in controversy are a part of such lands; the other, from the sixth and seventh sections of the act of Congress of March 3, 1853, granting to the State of California sections sixteen (16) and thirty-six (36), of each township, for the purposes of schools, and providing for the selection in certain cases of other lands in their stead, the parcels in controversy having been selected in part satisfaction of such school sections. 10 Stat. 244, c. 145.

It will facilitate the apprehension of the questions presented for determination if the claims of the defendant be first considered, and, therefore, to them we now direct our attention.

The act of Congress of September 4, 1841, to appropriate the proceeds of the sales of the public lands and to grant pre-emption rights designates in its first section several States to which ten per cent of the net proceeds of the sales of the public lands, made after a certain date, within their limits, shall be paid. Its eighth section is as follows: "And be it further enacted, That there shall be granted to each State specified in the first section of this act five hundred thousand acres of land for purposes of internal improvement: *Provided*, that to each of said States which has already received grants for said purposes, there is hereby granted no more than a quantity of land

which shall, together with the amount such State has already received as aforesaid, make five hundred thousand acres, the selections in all of the said States to be made within their limits respectively in such manner as the legislature thereof shall direct; and located in parcels conformably to sectional divisions and subdivisions, of not less than three hundred and twenty acres in any one location, on any public land except such as is or may be reserved from sale by any law of Congress or proclamation of the President of the United States, which said locations may be made at any time after the lands of the United States, in said States respectively, shall have been surveyed according to existing laws. And there shall be, and hereby is, granted to each new State that shall be hereafter admitted into the Union, upon such admission, so much land, including such quantity as may have been granted to such State before its admission, and while under a territorial government, for purpose of internal improvement as aforesaid, as shall make five hundred thousand acres of land, to be selected and located as aforesaid."

The first clause of this section, it will be observed, uses the words "there shall be granted," and not that "there is hereby granted," and they import, as held in *Foley* v. *Harrison*, 15 How. 433, 447, only that a grant shall be made in future. It was accordingly adjudged in that case that a patent of Louisiana for lands selected by her officers from the grant to the State under the act of 1841 did not pass the title to the patentee, the court observing: "It could not have been the intention of the government to relinquish the exercise of power over the public lands that might be located by the State. The same system was to be observed in the entry of the lands by the State as by individuals, except the payment of the money; and this was necessary to give effect to the act, and to prevent conflicting entries."

The authorities of California gave a different construction to the latter clause of the eighth section of the act of 1841. The words there used are, "there shall be, and hereby is, granted to each new State," which they treated as a present grant of the quantity designated, and not as the promise of

one in the future, construing the concluding words, "to be selected and located as aforesaid," as referring merely to the form of selection and the quantity of the several parcels, and not as limiting the location to lands previously surveyed. And they did not see any policy or interest of the general government to be subserved by postponing the possession and enjoyment of its bounty, so long as conformity was ultimately secured in the locations made with the public surveys. In *Doll* v. *Meador* the Supreme Court of the State said: "Conformity in the locations with the sectional divisions and subdivisions is required, to preserve intact the general system of surveys adopted by the Federal government, and to prevent the inconvenience which would ensue from any departure therefrom. When, therefore, any location is made by the State, previous to the survey of the United States, it must be subject to change, if, subsequently, upon the survey being made, it be found to want conformity with the lines of such survey. With this qualification, and the further qualification of a possible reservation by a law of Congress, or a proclamation of the President, previous to the survey — which may require further change, or the entire removal of the location — we do not perceive, either in the language of the act, or the object to be secured, any limitation upon the right of the State to proceed at once to take possession and dispose of the quantity to which she is entitled by the grant. It would hardly be pretended that she would be deprived of the bounty of the general government, if no surveys were ever directed by its authority, or that the enjoyment of the estate vested in her would be suspended indefinitely, by reason of its inaction in the matter." 16 California, 295, 315, 327.

The State legislated upon a similar construction of the latter clause of the act of Congress. Surveys of the public lands in California were not directed by any law of Congress until the year 1853, and were not made to any large extent for years afterwards, but in May, 1852, in advance of such surveys, the legislature of the State passed an act providing for the sale of the 500,000 acres. It authorized the governor to issue land warrants for not less than one hundred and sixty, and not

more than three hundred and twenty acres, in one warrant, to the amount of the 500,000 acres, and the treasurer to sell them at two dollars per acre, and the purchasers and their assigns to locate them, on behalf of the State, upon any vacant and unappropriated lands belonging to the United States within the State of California, subject to such location, but it declared that no such location should be made except in conformity to the law of Congress, in not less than three hundred and twenty acres in one body. The fifth section provided that the location should secure to the purchaser the right to the possession of the land until the government survey, after which the lines of the location should be made to conform to the lines of sections, quarter sections and fractional sections of such survey.

In July, 1853, one James T. Ewing purchased of the treasurer of California, under this act, two land warrants, issued by the governor of the State, each for one hundred and sixty acres. These warrants, by various transfers, came, in September, 1853, into the possession and ownership of one Stephen Franklin, who, during that month, located them upon three hundred and twenty acres of land in Santa Clara County, in one body, embracing the premises in controversy. The land located was sufficiently designated by lines, distances and courses in the field. The entry of the location was made in the office of the clerk of the county, and the lands were surveyed by its surveyor, who gave the locator a certificate setting forth its bounds and the number of acres it included. The clerk thereupon recorded the certificate in the book of records of schoolland warrants in his office. The county surveyor afterwards made out a duplicate of the survey and certificate of the location and forwarded them to the office of the surveyor general of the State. The location was made in conformity with the law of the State. The lands were unappropriated public lands of the United States, and were vacant, except as occupied by Franklin, the locator, and were located as part of the 500,000 acres granted to the State by the act of September 4, 1841. Franklin was then in the actual possession of the 106.84 acres in controversy, and other lands adjacent thereto, making, alto-

gether, five hundred and seventy-eight acres, which were cultivated and improved by him as a single farm. He occupied the whole tract until 1862, when his interest was purchased by James Donahue, now deceased, who went into possession of the premises and continued in their use until his death in 1864 or 1865, when his interest passed by devise or descent to his son, the defendant.

But, notwithstanding that in locating the state warrants Franklin complied with the requirements of the state law, and both he and his successor, James Donahue, continued in the possession and use of the land, their claim of title to the $106\frac{84}{100}$ acres under the location was not recognized by the Land Department of the general government. A great number of similar locations were treated in like manner. The right of the State to make any selections in advance of the public surveys of the United States was denied by the department, upon its construction of the act of Congress. And even when official surveys had preceded the location, the transfer of any title by the state authorities to the land located was also denied, the department taking the position that, until the lands selected were listed over or patented to the State, no title passed from the United States.

Under this conflict of opinion between the authorities of the State and of the Land Department as to the title to the land located under the land warrants issued by the governor, great embarrassment was experienced by holders of lands thus located, and interests of vast magnitude, which had grown up under the action of the State, were believed to be endangered. In this condition of affairs it is not surprising that the holders of the lands resorted to various measures to strengthen their title, and also sought relief from Congress.

There were several other grants of lands by Congress to the State, and for their sale provision was also made by different acts of the legislature. The act of Congress "to provide for the survey of the public lands in California, the granting of preëmption rights therein, and for other purposes," passed March 3, 1853, granted sections sixteen and thirty-six in each township to the State, as already mentioned, for school pur-

poses. And the same act, among other things, provided that where those school sections were taken by private claims other lands might be selected in their place by the proper authorities of the State. Those sections in one of the townships in Santa Clara County were included within the exterior limits of Mexican grants, subsequently confirmed. Accordingly, in 1862, the state authorities took measures, pursuant to an act of the legislature passed for such cases, to obtain other lands in lieu of them, and selected the $106\frac{84}{100}$ acres, in controversy in this action, and other land adjoining them, making in all $225\frac{80}{100}$ acres, in lieu of a portion of the school sections. The State then sold the lands to James Donahue, mentioned above, at the time a citizen of the United States, and he paid the full purchase price therefor, the last instalment on the 20th of January, 1864, and the State issued to him a certificate of purchase. In May, 1866, the township, in which the lieu lands selected were situated, was surveyed by the authorities of the United States, and the plat of the survey was returned and filed in the United States local land office of the district embracing the township. After the survey, and on the 30th of May, 1866, the state authorities again, and in part satisfaction of the grant by Congress of the school sections, selected and relocated the same $106\frac{84}{100}$ acres of land with the other lands adjoining, and on the same day notified, in writing, the register of the United States land office for the district of such selection and relocation. (Act relating to indemnity school selections in the State of California. 19 Stat. 267, c. 81.)

In 1864 the Supreme Court of California changed its previous ruling as to the power of the State to make selections from the grant in advance of the surveys of the general government, receding from its decision in *Doll* v. *Meador*, cited above, and holding that no title to any portion of the land granted vested in the State until such survey was made, thus giving no effect to the character of the grant as one *in præsenti*, and making the immediate enjoyment of the bounty of the government dependent upon the action of the surveying officers, rather than the will of Congress. *Terry* v. *Megerle*, 24 California, 609. This decision, whether or not subject to

criticism, was subsequently adhered to, and has been since so constantly followed by that court as to be no longer open to question; and the title of the State to the lands covered by the grant in question has been adjusted upon its assumed correctness. For the time, however, it served to increase the embarrassments previously existing of holders of locations made in advance of such surveys. It left them without any protection except that arising from their possession.

As stated above, relief was sought by an appeal to Congress from the embarrassments following this state of affairs, which was asked not only for holders under the selections and locations mentioned, but also for holders under other grants to the State, and such appeal resulted in the passage on July 23, 1866, of the act to quiet land titles in California. 14 Stat. 218, c. 219. Upon this law the defendant relies for the confirmation of his title to the lands located under the land warrants by his predecessor in interest, Stephen Franklin, as part of the 500,000 acre grant, and that defence failing, upon the confirmation of his title to the indemnity lands selected in part satisfaction of the school sections taken by Mexican grants.

. The first section of the act declared that in all cases where the State of California had previously made selections of any portion of the public domain in part satisfaction of a grant made to the State by an act of Congress, and had disposed of the same to purchasers in good faith under her laws, the lands so selected should be and were thereby confirmed to the State. The words of the section are, "the lands so selected shall be, and hereby are, confirmed to said State." From this confirmation were excepted selections of lands to which any adverse preëmption, homestead or other right had, at the date of the passage of the act, been acquired by a settler under the laws of the United States, and of lands reserved for naval, military or Indian purposes, and of mineral lands, or of lands claimed under a valid Mexican or Spanish grant, or of land which, at the passage of the act, was included within the limits of any city, town or village, or within the county of San Francisco.

The second section provided that where the selections mentioned in the first section had been made of land which had

been surveyed by authority of the United States, it should be the duty of the authorities of the State, where it had not already been done, to notify the register of the United States land office for the district in which the land was located, of such selections, and that the notice should be regarded as the date of the State's selection; and it required the Commissioner of the General Land Office, immediately after the passage of the act, to instruct the several local registers to forward to the General Land Office, after investigation and decision, all such selections which, if found to be in accordance with section one of this act, the Commissioner should certify over to the State in the usual manner.

The third section provided that where the selections named in the first section had been made of land which had not been surveyed by authority of the United States, but which had been surveyed by authority of and under the laws of the State, and the land sold to purchasers in good faith, such selections should, from the date of the passage of the act, when marked off and designated in the field, have the same force and effect as preëmption rights of a settler on unsurveyed public lands.

Under the provision of the first section of this act the defendant contends, and the court below ruled to that effect, that the lands selected from the grant by the act of 1841, that is, from the 500,000 acres donated to the State, were confirmed and the title of the State thereto perfected. The confirmation, it was argued, operated as a present grant, and perfected the State's title from the date of the act. That construction would undoubtedly be correct if the provisions of the first section were not modified by those of the second section. The first section declares in general terms that where selections of any portion of the public domain have been made by the State in part satisfaction of a grant of Congress to her, and she has disposed of the same to purchasers in good faith under her laws, the lands so selected are confirmed to the State. The object of the section is to confirm the title to lands thus selected and sold by the State. But the second section declares that when the selections have been made of lands surveyed by authority of the United States, it shall be

the duty of the state authorities, when it had not already been done, to notify the register of the United States local land office of such selections, and that this notice shall be regarded as the date of the State's selection. It follows, therefore, that the lands confirmed by the first section are those selected from lands previously surveyed by authority of the United States, and of which selection notification had been or should thereafter be given to the register of the local land office. Now it does not appear, from the record, that any lands under consideration in this case were selected from the grant of 1841, that is, from the grant of 500,000 acres, after the lands had been surveyed by authority of the United States, and, of course, no notification had been or could be given of any such selection. The selections made under that grant, that is, the locations upon the state warrants possessed by Franklin, were of lands surveyed only by authority of the State, and such selections when marked off and designated on the field could, by the third section of the act of 1866, only have the force and effect of preëmption rights of a settler on unsurveyed public lands. Such recognition could be of no benefit to the defendant in establishing his defence in the present case. It is, therefore, upon the effect of the act of 1866, on the lieu lands selected in place of the school sections covered by the Mexican grants, that he must rely. Notification of such selections was made to the register of the local land office, after the survey in May, 1866, of the township in which the selected lands were situated.

It follows that by the first section of the act of 1866, as modified by the second section, the lieu lands selected in place of the school sections, after the survey of the township, were confirmed and the title of the State thereto was perfected from the date of the act. The legislative confirmation was not only a recognition of the validity of the claim of the State, but it operated as effectually in perfecting her title as a grant or quit-claim from the government. As held in *Langdeau* v. *Hanes*, 21 Wall. 521, 530, " if the claim be to land with defined boundaries or capable of identification, the legislative confirmation perfects the title to the particular tract, and a subsequent

patent is only documentary evidence of that title." The tract confirmed here was of specific boundaries, and, after the confirmation, no further evidence of the title of the confirmee was needed. As this court said in *Whitney* v. *Morrow*, 112 U. S. 693, 695 : "If by a legislative declaration a specific tract is confirmed to any one, his title is not strengthened by a subsequent patent from the government. That instrument may be of great service to him in proving his title, if contested, and the extent of his land, especially when proof of its boun-. daries would otherwise rest in the uncertain recollection cf witnesses. It would thus be an instrument of quiet and security to him, but it could not add to the validity and completeness of the title confirmed by the act of Congress." The confirmation of the State's title enured immediately to the benefit of her grantee, the father of the defendant, without any further action of the Land Department or of the State.

The plaintiff contends against this conclusion that be obtained a better right to the demanded premises under the grant of July 2, 1862, to the State of land for the establishment of an agricultural college, or college for the mechanic arts, alleging that such premises were a part of the land apportioned to the State under that grant. To the consideration of that position we now turn our attention.

On the 2d of July, 1862, Congress passed an act "donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts." 12 Stat. 503, c. 130. The first section provides as follows : " That there be granted to the several States, for the purposes hereinafter mentioned, an amount of public land, to be apportioned to each State a quantity equal to thirty thousand acres for each senator and representative in Congress to which the States are respectively entitled by the apportionment under the census of eighteen hundred and sixty : *Provided,* That no mineral lands shall be selected or purchased under the provisions of this act." Under this section the State of California became entitled to one hundred and fifty thousand acres for the purposes designated.

The second section of the act provides as follows : " That

the land aforesaid, after being surveyed, shall be apportioned to the several States in sections or subdivisions of sections, not less than one-quarter of a section; and whenever there are public lands in a State subject to sale at private entry at one dollar and twenty-five cents per acre, the quantity to which said State shall be entitled shall be selected from such lands within the limits of such State, and the Secretary of the Interior is hereby directed to issue to each of the States in which there is not the quantity of public lands subject to sale at private entry at one dollar and twenty-five cents per acre, to which said State may be entitled under the provisions of this act, land scrip to the amount in acres for the deficiency of its distributive share."

The act also contains various provisions intended to secure the proper application of the proceeds of the sale of the lands donated to the purposes intended. It also declares that no State shall be entitled to its benefits unless the State expresses her acceptance of the act within two years from the date of its approval, a period which was, by a subsequent act, extended for two years more. California, however, expressed her acceptance within the time required, and, on the 23d of March, 1863, passed an act to create and organize the University of California, which embraced provisions for a college for the benefit of agriculture and the mechanic arts.

By subsequent acts the State was allowed to select the lands granted from any lands within her limits, subject to preemption, settlement, entry, sale or location under any laws of the United States. 15 Stat. 67, c. 55, § 4, p. 68; 16 Stat. 581, c. 126.

On the 10th of September, 1873, one William W. Johnston made application to the regents of the University of California to purchase the one hundred and six acres and a fraction of an acre in controversy in this case, under the act of Congress of July 2, 1862, and his application was accepted. On the following day, September 11, 1873, the land agent of the university proceeded to select and locate several parcels of land in the office of the register of the United States for the district, including the lands which Johnston had applied to pur-

chase, and gave him a certificate, he, at the time, paying $111.84, that being all that was then required of him. On the 2d of November, 1874, the parcels of land selected were certified by the Commissioner of the General Land Office as being subject to selection under the act of July 2, 1862, and free from conflict, and the list was approved by the, Secretary of the Interior, subject to any valid interfering rights existing at the date of the selection. On the 24th of April, 1879, Johnston assigned and transferred his certificate of purchase to the plaintiff, and he paid to the regents of the university—the balance of the purchase price. At the time of his application to purchase, and of payment on account, Johnston had notice of the defendant's rights and interests in the premises; and the plaintiff also had such notice at the time of the assignment to him and his payment of the balance of the purchase money. On the first of June, 1882, the United States listed over the lands to the State, and, on the 17th of that month, the State executed her patent to the plaintiff for the premises in controversy. Upon this patent the plaintiff asserts title to the premises and claims their recovery. The proceedings taken for the acquisition of the land appear to have been regular in form and to have been sufficient to transfer the title to the State had not the property been previously vested in the defendant by the purchase by his father of the lands selected in place of the school sections covered by Mexican grants.

Our conclusion is that, after the confirmation by the first section of the act of July 23, 1866, of the lands in controversy selected in place of the school sections, the township in which the selected lands are situated having been previously surveyed by authority of the United States, the premises were not subject to the grant to the State for the establishment of an agricultural college. No title to lands under that grant vested in the State until their selection, and listing to the State, which was some years subsequent to the time at which the title of the United States passed to the defendant.

There was no such trust created by the act making the grant of July 2, 1862, and its acceptance by the State, as to

prevent land, which might otherwise have been selected for the establishment of the college intended, from being previously selected by other grantees of the United States of unlocated quantities of land. No trust against the State could arise until proceeds from the sale of the property granted, or some portion of it, had been obtained and come into her possession. Whatever disposition she might subsequently make of the proceeds, in carrying out the object intended, or in defeating it, could have no bearing upon the title acquired by other parties from the sale of the lands. *Mills County* v. *Railroad Companies*, 107 U. S. 557; *Emigrant Co.* v. *County of Adams*, 100 U. S. 61; *Cook County* v. *Calumet & Chicago Canal Co.*, 138 U. S. 635, 655.

The judgment must, therefore, be                    *Affirmed.*