**GOUNER et al. v. POLMER et al.**

No. 11571.

Circuit Court of Appeals, Fifth Circuit.

June 27, 1946.

Rehearing Denied Aug. 6, 1946.

Leo L. Dubourg and Posey R. Bowers, both of New Orleans, La., for appellants.

Harry McCall, James C. Henriques, and Jack A. Bornemann, all of New Orleans, La., and Harvey Peltier, of Thibodaux, La., for appellees.

Before McCORD, WALLER, and LEE, Circuit Judges.

McCORD, Circuit Judge.

The bill of complaint recites that one Deval was the true and lawful claimant to approximately a section of land located in

the parish of Terrebonne, Louisiana, and that he received a certificate of confirmation to his rights in such claim and was entitled to have a patent issued therefor from the General Land Office, Department of Interior of the United States, but that through certain frauds practiced by one Samuel Harper, Register of the Eastern District of Louisiana, it was made to appear that the claim of one Thomas Villaneuva to the land in dispute had been confirmed, and an order of survey in favor of Villaneuva was issued by Harper.

The bill further alleges that Deval filed his claim in conformity with the federal statutes, and that he went upon such lands in the year 1802, with the permission of the proper Spanish officer, with the purpose and intention of settling thereon, and marked trees to designate a boundary and cleared a road, but the Land Commissioner of the territory of Orleans found that such lands had never been inhabited and cultivated until after the 20th day of December 1803, and his claim was rejected.

Thereafter, the complainants allege that by Act of Congress of April 12, 1814, 3 Stat. 121, it was provided that all persons, or their legal representatives, claiming lands in the State of Louisiana by virtue of any incomplete French or Spanish grant or concession, or any warrant or order of survey, which was granted prior to the 20th of December, 1803, covering lands in the State of Louisiana, and whose claims had been filed with the proper register or recorder for lands according to law and were embraced in the report of the Commissioners or Register or Recorder, and where it should appear that the concession on which the claim was made contained a special location, or had been actually located before the 20th day of December 1803, such persons were by the provisions of said Act confirmed in their claims where it appeared on the face of the report of the Commissioners or Register or Recorder that the claim of such persons had been rejected for the want of proof of residence or inhabitance prior to December 20, 1803.

According to the provisions of the Act of Congress of April 12, 1814, the claim in order to be confirmed must appear in the report of the Commissioners to have been rejected by the Commissioners, and this evidence must appear on the face of the report of the Commissioners and could not be supplied in any other manner.

Thomas Villaneuva laid claim to the identical lands claimed by Deval, and Sam Harper, Register, ordered surveyed and certified this claim which had been by Act of April 12, 1814, confirmed to Villaneuva. Villaneuva and those claiming under him caused Deval to be driven or ejected from these lands on or about the year 1828. By deed dated January 1, 1811 and registered August 27, 1811 in Book "E", folio 21, of the Conveyance Records of the Parish of Terrebonne, Villaneuva conveyed the land to Pierre Dennis de la Ronde, the consideration therefor being a bet on a lottery. Pierre Dennis de la Ronde conveyed the lands to Joseph M. Ducros, from whom the defendants claimed their title through mesne conveyances.

Complainants in August or September, 1937, applied to the General Land Office, Department of Interior, to make a survey of the lands covered by Deval's Claim No. 595, and to have a patent issued therefor in his name and for the benefit of his heirs and legal representatives. However, on December 21, 1937, the General Land Office issued a patent, No. 1094750 in favor of Thomas Villaneuva, his heirs and assigns, recognizing his claim No. 115 as having been confirmed by the Act of April 12, 1814, and that the claim had been regularly surveyed and designated as Sections eighty-one and ninety-three in Township fifteen, south of Range sixteen east of the Louisiana Meridian, Louisiana, containing six hundred seventy-six acres and sixty-nine hundredths of an acre, according to the official plat of Survey of the Lands on file in the General Land Office, approved September 30, 1856. This patent was recorded in the Conveyance Records of the Parish of Terrebonne.

Complainants waive in these proceedings any claim to any portion of the lands to which they may be entitled under Deval's claim and which have been heretofore conveyed to the United States or to any agency thereof, and particularly that portion conveyed by J. Boyd Ewing to the Rural Resettlement Administration.

The bill sets up the manner in which the complainants claim to have inherited from Deval. Deval died in the year 1845.

The State of Louisiana, through the Louisiana Highway Commission, claims an adverse title to complainants in certain parcels of land embraced within Deval's claim No. 595, but complainants do not ask the State to be made a party defendant, and they reserve such right as they may have against the State.

The prayer of the complaint is for a decree that defendants and each of them have no estate or interest whatever in the lands in question and that they be enjoined and restrained from asserting any claim whatsoever to the land.

The decree of the District Court dismissed complainants' suit on a motion which set forth that "it is apparent on the face of the complaint that the defense of laches is well founded," and "it is further apparent on the face of the complaint that the State of Louisiana is a necessary and indispensable party and cannot be brought before the Court."

It has been difficult to marshal the facts from the bill of complaint in a short and concise manner. It can best be summarized in this wise: Deval asserted claims to the lands by reason of action taken in 1802, when the Spanish government owned and controlled what was afterwards known as the Louisiana Purchase. His claims consisted of two claims, No. 469 and No. 595, whereas Villaneuva, the defendants' ancestor, rested his claim on action taken in 1802, which may have been prior in point of time to Deval's claim, since the Villaneuva claim was No. 115. Moreover, Villaneuva's claim was recognized by the Register as having been confirmed to him under the Act of April 12, 1814, by certificate dated August 11, 1828. It is manifest that the Government passed title by the enactment of the Congress of April 12, 1814 to Villaneuva, and the patent which was issued to him in the year 1937 was only documentary evidence of his title.

"In the Legislation of Congress a patent has a double operation. It is a conveyance by the Government when the Government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation." Langdeau v. Hanes, 21 Wall. 521, 529, 88 U.S. 521, 529, 22 L.Ed. 606.

The many enactments of Congress which were passed under and by authority of Sec. 3 of Article IV of the Federal Constitution will disclose, in some sort, the task which was before this Government in an effort to establish and fix title to these lands. These Acts date from March 28, 1804 to May 20, 1836, and comprise a long line of enactments.

The fraud which is alleged was certainly known by Deval at the time he was driven from the lands, and which was sometime about the year 1828. He thereafter, so far as the record discloses, made no effort to have his alleged claim tested and set at rest. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others and cannot be excused except by showing some actual hindrance or impediment caused by the fraud of the party in possession, and no such showing is made here. Langdeau v. Hanes, 21 Wall. 521, 88 U.S. 521, 22 L.Ed. 606; Morrow v. Whitney, 95 U.S. 551, 24 L.Ed. 456; Joplin v. Chachere, 192 U.S. 94, 24 S.Ct. 214, 48 L. Ed. 359; Gonsoulin's Heirs v. Gulf Co., 5 Cir., 116 F. 251; 198 U.S. 115, 117, 118, 25 S.Ct. 608, 49 L.Ed. 970; Richards v. Mackall, 124 U.S. 183, 187, 8 S.Ct. 437, 31 L.Ed. 396; Bryan v. Kales, 134 U.S. 126, 135, 10 S.Ct. 435, 33 L.Ed. 829; Hammond v. Hopkins, 143 U.S. 224, 12 S.Ct. 418, 36 L.Ed. 134; Martin v. Gray, 142 U.S. 236, 12 S.Ct. 186, 35 L.Ed. 997; Alsop v. Riker, 155 U.S. 448, 459, 15 S.Ct. 162, 39 L.Ed. 218; Abraham v. Ordway, 158 U.S. 416, 420, 15 S.Ct. 894, 39 L.Ed. 1036.

"No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecut-

210

ing rights, or where long acquiescence in the assertion of adverse rights have occurred." Marsh v. Whitmore, 21 Wall. 178, 22 L.Ed. 482; McKnight v. Taylor, 1 How. 161, 168, 11 L.Ed. 86; Lansdale v. Smith, 106 U.S. 391, 392, 1 S.Ct. 350, 27 L.Ed. 219; Norris v. Haggin, 136 U.S. 386, 10 S.Ct. 942, 34 L.Ed. 424.

The very clear and concise findings and decree of the lower court are in all respects affirmed.