## KNAGGS v. CLEVELAND-CLIFFS IRON CO.

(Circuit Court of Appeals, Sixth Circuit. February 6, 1923.)

No. 3683.

1. Courts ⬤⟶352—Cause "at issue" on filing of answer.

A cause is at issue, within the meaning of equity rules 47 and 56 (198 Fed. xxxi. xxxiv, 115 C. C. A. xxxi, xxxiv), when the answer is filed, and the subsequent filing of an amended answer does not of its own force operate to extend the time for hearing.

[Ed. Note.—For other definitions, see Words and Phrases, At issue.]

2. Acknowledgment ⬤⟶6(2)—Defective acknowledgment held not to render deed void.

A deed to land in Ohio, made in 1835, was signed by two men and their wives, and duly witnessed and recorded, but the name of one of the men did not appear in the acknowledgment. Such signer lived for 30 years thereafter, but there is no competent evidence that he ever questioned the validity of the deed, though grantees were in possession. *Held* that, under Gen. Code Ohio, § 8558, the record of the deed was admissible in evidence, and it was valid, at least as a contract to convey, as against heirs of such grantor.

3. Specific performance ⬤⟶105(3)—Vendees in possession not chargeable with laches.

Vendees under a defective deed, or their successors, who are in undisputed possession, are not chargeable with laches, which will bar a suit for specific performance of the contract to convey, and especially in view of Gen. Code Ohio, § 11236, expressly so providing.

4. Equity ⬤⟶72(4)—Suit to recover interest in land barred by laches.

Delay by complainant, for more than 45 years after attaining her majority before asserting her claim to an interest in land as heir of her father, *held* such laches as to bar a suit for its recovery, where during the greater part of the time defendant and its predecessors in interest had been in possession under claim of title, and had expended large sums in improvements.

5. Courts ⬤⟶375—Laches may be defense in federal courts, regardless of state statute of limitations.

The federal courts enforce the doctrine of laches when the lapse of time has been shorter than that prescribed by state laws, where the peculiar circumstances give rise to an equity which the court is bound to protect.

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Suit in equity by Antoinette Knaggs against the Cleveland-Cliffs Iron Company. Decree for defendant, and complainant appeals. Affirmed.

Edwin J. Lynch, of Toledo, Ohio (Hackett & Lynch, of Toledo, Ohio, on the brief), for appellant.

Frank M. Cobourn, of Toledo, Ohio (Wm. P. Belden, of Cleveland, Ohio, and Tracy, Chapman & Welles, Thos. H. Tracy, and Frank M. Cobourn, all of Toledo, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. The parties were aligned below as here. This appeal is from a decree in a suit in equity arising from this situation:

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

By the treaty of February 18, 1833 (7 Stat. 420, 421), between the United States and the band of Ottawa Indians residing on the reserve on and in the vicinity of the Maumee river, there was reserved to Au-to-kee, an Ottawa chief, a tract of about 320 acres at the river's mouth, including Presque Isle; the treaty stipulating that the land so reserved should not be alienated without the approval of the President of the United States. On June 3, 1835, Au-to-kee sold and conveyed to Robert A. Forsythe and George B. Knaggs, in fee simple, out of this 320-acre tract, a parcel of about 80 acres, now of great value, and lying on the east bank and at the mouth of the river, near the site of the city of Toledo. On November 18, 1835, there was recorded in the proper register's office a purported conveyance of this 80-acre tract by Knaggs and Forsythe, and their respective wives, to Daniel Chase in fee simple. The approval by the President of the United States of Au-to-kee's conveyance to Forsythe and Knaggs was not made until September 11, 1854, and no conveyance was made by the United States to Au-to-kee until August 20, 1895. This patent, which was in practical effect only a quitclaim deed, was superseded on November 28, 1898, by a patent to Au-to-kee in fee simple. On August 21, 1835, Daniel Chase, grantee in the deed from Knaggs and Forsythe of November 18, 1835, conveyed the entire parcel to John W. Clark, by warranty deed in fee simple. On May 31, 1845, the entire parcel in question, described as containing 60 acres of land (the original acreage had been reduced by the action of the waters of the bay), was conveyed by the proper authorities of the state of Ohio to James Myers, for forfeiture and reforfeiture of the land for nonpayment of taxes levied thereon by the state of Ohio; this deed being duly recorded. On July 10, 1906, defendant acquired the title conveyed by Chase to Clark; also the title obtained by Myers under the Ohio tax proceedings. On July 22, 1920, plaintiff, who is the sole heir at law of George B. Knaggs (who died in 1865), began this suit, asserting her ownership by virtue of such heirship of an undivided one-half interest in Presque Isle (denying that her father had ever conveyed his interest in the land), and asking partition thereof and accounting.

The defenses set up were: The due execution by Knaggs of the deed to Chase; the tax deed of 1845; adverse possession by defendant and its predecessors in title; and laches on plaintiff's part with respect to the assertion of her claim. By counterclaim quieting of the defendant's title was asked.

The District Court held that, whether or not Knaggs acknowledged the deed, it was otherwise duly executed by him, and so operated as a valid agreement to convey, entitling defendant to its specific enforcement; that the tax deed was a valid conveyance of the entire tract; that defendant and its predecessors in title had for more than 21 years before suit was begun been in adverse and exclusive possession of the entire tract, under claim of title thereto in fee simple; and that plaintiff was further barred by laches, through nonassertion of her claim for more than 48 years after attaining legal majority. Plaintiff's bill was accordingly dismissed, and defendant's title quieted.

[1] As precedent to the merits: The suit was begun in the state court, and removed by defendant to the District Court below. Defendant's answer (with cross-bill) was filed September 20, 1920. On May 7, 1921, an amendment thereto was filed. On May 31 plaintiff entered motion to remand to the state court, for the reason that the amended answer showed that the original defendant had been succeeded by a new corporation, whose citizenship destroyed the diversity existing when the bill was filed. On the next day this motion was denied, as was also plaintiff's application to continue the trial; defendant having stipulated that plaintiff's absent witnesses would testify as claimed in the affidavit for continuance. An application for a jury was also denied. The motion to continue, as made, was within the trial court's discretion, no abuse of which appears. Plaintiff contends here that the cause was not at issue until May 7, 1921, and under equity rules 56 and 47 (198 Fed. xxxiv and xxxi, 115 C. C. A. xxxiv and xxxi) could not properly be put on the trial calendar until 110 days after it was so at issue. We think this contention without merit. In our opinion the cause was at issue, within the meaning of the rules, on September 22, 1920; the amendment to defendant's pleading not of its own force operating to extend the time for hearing for another 110 days. The questions arising under the motion to remand and the application for jury are not argued in plaintiff's brief. We content ourselves with saying that we have considered these questions, and see no substance in either of them.

[2] Turning to the merits: We think the District Court rightly found that the purported deed from Knaggs and Forsythe to Chase was duly executed by Knaggs, unless in respect of acknowledgment. It was received in the office of the register of deeds for record 15 days after the date of the instrument. It purports to bear the signatures (under seal) of both Knaggs and his wife and of Forsythe and his wife, and to have been acknowledged on the date of the deed by Forsythe and by "Almyra Forsythe and Matilda Knaggs, wifes of said Robert A. Forsythe and George B. Knaggs"; the signature of each of the four purported grantors being witnessed by the justice of the peace who made the certificate of acknowledgment, the signatures of Forsythe and wife being attested by a further subscribing witness, and those of Knaggs and wife by still another witness. This situation, in connection with the language of the certificate of acknowledgment, suggests a possible clerical and unintentional omission therefrom of the name of George B. Knaggs as one of those acknowledging. However this may be, the recorded instrument purports to have been signed, sealed and delivered by Knaggs and wife in the presence of two subscribing witnesses. There is no competent evidence tending to impeach or question the actual execution and delivery of the deed by Knaggs. On the contrary, the probability of such execution and delivery is supported by contemporaneous history, including the reference to such deed (containing the date thereof) in the conveyance by Chase to Clark, made but 18 days later, which last-mentioned conveyance was recorded in the proper Michigan county on the very day on which the Knaggs and Forsythe deed to

Chase was received for record, and the further fact that since November 11, 1854 (11 years before Knaggs' death), the instrument was recorded in Lucas county, Ohio (of which county, through the change of state lines, the land had meanwhile become a part), and the acquiescence by Knaggs during the remainder of his life in the apparent effectiveness of the conveyance to Chase.[1] The public record of the Knaggs and Forsythe deed was made 85 years before this suit was begun. Presumably every one acquainted with the actual facts respecting its execution and acknowledgment has died. The deed, however, purports, not only to have been executed and delivered by both Knaggs and his wife, and not only to have been executed and delivered by Forsythe and wife, but to have been duly acknowledged by the latter two. It was thus entitled to record. Independently of the common-law rules applicable to ancient records, by the express terms of the Ohio statute (section 8558), which we quote in the margin,[2] the record of the deed, although defective in respect of acknowledgment by one of the grantors, was prima' facie evidence that "such instrument was executed and existed as shown by such record." We may add that the defense of nonexecution by Knaggs (omitting acknowledgment), although execution generally was denied by plaintiff's pleading, does not seem to have been seriously pressed on the trial. The record of the deed in question was offered in evidence by plaintiff's counsel. To the court's inquiry, "What is wrong with the deed?" plaintiff's counsel replied, "He did not acknowledge it."

[3] It results from what has been said that the Knaggs deed must be accepted as at least a contract to convey, under which the purchase price has been fully paid as recited in the instrument. We see no force in the defense of laches by defendant through delay in asking specific performance, not only because defendant and its grantors had been for many years in peaceable possession of the land and performing acts of ownership thereover, which possession was notice

---

[1] In each of the three successive deeds of conveyance following that from Chase to Clark, in 1835, and to and including that from Ketcham to Two Stickney, in 1855, the land is described (as in Chase's deed to Clark) as that part of the old Indian reservation called Presque Isle, and as the same tract which was sold and conveyed by the Indian chief Au-to-kee to R. A. Forsythe and George B. Knaggs, and from Forsythe and Knaggs to Daniel Chase. In the course of administration upon the estate of George B. Knaggs, in the probate court of Lucas county, Ohio, in 1866 and 1867, the land in question was not mentioned, appraised or in any way involved, so far as shown by the records of administration. The report of the administratrix (the widow of decedent) negatives the existence of property other than shown by the records.

[2] "Section 8558. When a conveyance of real estate has been executed in which there is a mistake, defect or omission, in the description of the lands, execution, acknowledgment or otherwise, and it has been recorded in the recorder's office of the county where the lands now are, or were situated at the time of such record, the record or a certified copy thereof in an action to cure or supply such defect, mistake, or omission, or to compel the execution of a valid conveyance of such real estate may be read in evidence, and shall be prima facie evidence that such instrument was executed and existed as shown by such record."

of its and their equitable rights, but by virtue of the express declaration of the Ohio statute (G. C. § 11236) that the provisions of the chapter respecting lapse of time as a bar to suit "shall not apply * * * to an action by a vendee of real property, in possession thereof, to obtain a conveyance of it." This conclusion is, of itself, enough to require the affirmance of the decree below.

[4] In our opinion, however, the District Court rightly held plaintiff further debarred from relief by laches. Plaintiff has lived in Lucas county, Ohio, all her life. She was 21 years old in 1872. She says her father told her that he did not sign the deed to Chase, but that he said it would not do any good for him or others to take possession, because "the deed had never been ratified, and it was only an Indian title that any of them had, he or any of the rest" [8] (as already said, Au-to-kee's conveyance was approved 11 years before Knaggs' death). Since the conveyance to Chase, the latter and those claiming under him, including defendant, have always claimed title to the entire of the tract under warranty deeds purporting to convey the entire title. The island came into the hands of an amusement company about the year 1887, under title traced from Chase. That company took possession, made improvements, including construction of dance hall, restaurant, etc., which were operated for several years during the amusement season. From and after June 12, 1855, down to the time suit was begun, taxes levied by the state of Ohio upon the entire of the tract have been regularly paid by the various parties asserting title thereto, beginning with Stickney, and down to and including defendant.

Since 1887, at the latest, defendant and those under whom it claims have had actual possession of the premises, making from time to time improvements other than specifically referred to herein, including the maintenance of docks, protective piling, etc. In 1906, defendant made its purchase, which was prominently featured in Toledo newspapers, one of which announced that the purchase meant that defendant—

"will eventually enter into possession of the property. It also means the improvement of this property two or three years hence by the erection of an immense steel plant and two or three blast furnaces. The industry will give employment to several thousand men."

Since that time, and until the advent of the Air Nitrates Corporation in 1918, the property had been generally maintained and cared for by defendant.

Until the commencement of this suit, in 1920, plaintiff has asserted no claim to any interest in the premises coming to the notice of any one in possession of the premises, or to any holder of title thereto under chain of title from Au-to-kee to defendant, with this exception: In 1918 the Air Nitrates Corporation took possession of the premises, and made highly expensive improvements.[4] To this cor-

[8] This, of course, was incompetent, unless as affecting the question of plaintiff's laches. Plaintiff was 14 years old when her father died.

[4] In July, 1918, the Air Nitrates Corporation was given possession of the premises by defendant pending negotiations for their purchase at a

poration, on July 17, 1918, plaintiff asserted a claim of one-half ownership of the submerged half of the original 80-acre tract, "directly in front of the land purchased by you." As she said at the trial:

"After the government took it, I made up my mind, if there was any chance for me, I was going to try it. I did not think to get the upland, but I thought I could get the island." [5]

The only considerations asserted by plaintiff (so far as they call for attention) as operating to defeat limitation by adverse possession, or laches in the assertion of claim was that the act of the war department, in taking and holding possession of the premises, created a break in the continuity of defendant's possession, and that until the recording in Lucas county, Ohio, in 1900, of the United States patent to Au-to-kee, plaintiff had no legal title, and so could maintain no action. Even if the latter proposition were true (to which we must not be understood to assent), about 20 years elapsed before suit was begun, and 18 years before the assertion of claim to the Air Nitrates Corporation.

[5] In the view we take of the case, it is not necessary to decide whether adverse possession was continuous for the full statutory period of 21 years. State statutes of limitation are not binding upon the federal courts in equity, and the question whether relief is barred depends only upon whether plaintiff has been guilty of laches. The courts of the United States have frequently enforced the doctrine of laches, where the lapse of time has been shorter than that prescribed by state laws, but where the peculiar circumstances gave rise to an equity which the court was bound to protect. Richards v. Mackall, 124 U. S. 183, 188, 8 Sup. Ct. 437, 31 L. Ed. 396; Alsop v. Riker, 155 U. S. 449, 460, 15 Sup. Ct. 162, 39 L. Ed. 218; Penn Mutual Life Ins. Co. v. Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626; Patterson v. Hewitt, 195 U. S. 309, 319, 25 Sup. Ct. 35, 49 L. Ed. 214; Kentucky Coal, Etc., Co. v. Kentucky Union Co. (C. C. A. 6) 187 Fed. 945, 948, 110 C. C. A. 93; Estep v. Kentland Co. (C. C. A. 6) 239 Fed. 617, 621, 152 C. C. A. 451.

We see no escape from the conclusion that plaintiff's laches has

price of several hundred thousand dollars. The parties were subsequently unable to agree on the price, and in June, 1919, defendant withdrew its offer of sale. Five days later the War Department requisitioned the property under the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛e et seq.), and on July 1, 1919, the government brought condemnation proceedings (which are still pending) to acquire the ownership of the property, The title has always remained in defendant, which is recognized by the government as owner in July, 1918, and previously. No part of the purchase price has ever been paid to defendant. The Air Nitrates Corporation, or the government, or both together, have spent several millons of dollars in improvement of the property. According to undisputed testimony, at the time of the trial below the department was negotiating with defendant "to purchase it [presumably the improvements] at salvage."

[5] The word "island" appears in the transcript. In view of plaintiff's letter to the Air Nitrates Corporation, it would seem not improbable that reference was intended to "lowland," or submerged land.

barred whatever equities, if any, she might have had. It is thus unnecessary to consider the effect of the state tax deed of 1845.

The judgment of the District Court is affirmed, both by way of specific enforcement of valid contract to convey and for plaintiff's laches in the assertion of her claim.