240

TALMADGE v. UNITED STATES SHIPPING BOARD, EMERGENCY FLEET CORPORATION.
No. 18.

Circuit Court of Appeals, Second Circuit.
Nov. 2, 1931.

On Rehearing Jan. 11, 1932.

Delafield, Thorne & Burleigh, of New York City (Colley E. Williams, Claude A. Hope, and James J. Kirwin, Jr., all of New York City, and Charles T. Murphy, of New Rochelle, N. Y., of counsel), for appellant.

George Z. Medalie, U. S. Atty., and O. P. M. Brown, of Washington, D. C., for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This is an action upon an assigned claim to recover from the Fleet Corporation payments made by it to the American Shipbuilding Company, which should have gone to the plaintiffs' assignors. It will be convenient to ignore the assignment and speak of the assignors as the plaintiffs. The situation arose out of a contract made in June, 1917, between the Shipbuilding Company and the defendant, by which the company was to build four wooden hulls at stated prices, payment to be made by cheques deliverable as the work progressed. In September, 1917, the Shipbuilding Company, whose resources alone were not enough to finance the project, asked the plaintiffs to lend it money as the work progressed. The plaintiffs were willing to do so, but wished as security an assignment from the Shipbuilding Company of the payments as they fell due, to which the company agreed, both sides correctly understanding that the contract gave the contractor power

to assign. Since this power was, however, itself subject to the defendant's refusal, the parties thought it necessary to put their proposed arrangement before the proper officials.

One Bender was the defendant's general auditor, and it is not questioned that notice to him was notice to it. Both parties asked Bender's consent to an assignment, which while it was not expressly so stated, we may assume to have contemplated that the cheques as they became due should be made to the plaintiffs' order, and sent directly to them. Bender, perhaps because he misunderstood the request of the Shipbuilding Company, perhaps because in any case he was unwilling to make the cheques in that way, answered the plaintiffs on September twenty-fifth, that he would mail to them cheques payable to the Shipbuilding Company, adding, apparently by way of caution: "This is not a formal assignment." If Bender did not then know it, at least he learned by December tenth that the plaintiffs were financing the enterprise, and it was certainly a natural, if not inevitable, conclusion, that the cheques were delivered to them as security for their loans. A jury might well have found that he must so have understood the arrangement.

In conformity with his agreement Bender until April 19, 1918, sent all cheques to the plaintiffs; but from that time forward he or his assistants sent a great number direct to the company, ranging in amount from forty-two cents to over thirty thousand dollars, and making in all about $570,000. Of these all but about $40,000 were sent after June first. During the same period he sent to the plaintiffs eleven cheques, aggregating about $253,000, which, with those they had already received, came to about the same amount as those sent to the company. As the plaintiffs had advanced some $479,000 beyond the sums covered by the cheques they had received, they found themselves unsecured to that extent. Their theory is that it was a wrong for Bender, having notice of the assignment, to recognize the company's demand and to deliver the cheques to it; and that for this wrong the defendant is liable.

In July, 1918, the defendant wished to cancel the contract and substitute another on a "cost plus" basis. Learning of this, the plaintiffs wrote on July 26, 1918, asking what effect the cancellation would have upon their rights, and incidentally noting some surprise that they had had no payments since the first of the month. Bender answered on August ninth, saying that all pay-

ments had been mailed to them, except that "recent payments had been made to the contractor at Brunswick at his request." This he excused on the ground that he had originally acted only at the request of the Shipbuilding Company, which had power to change its instructions. Because of the proposed substitution of a new contract he must know, he said, what liabilities were open against the old, and he therefore asked the plaintiffs how far they were "interested" in it.

The plaintiffs answered by wire on the fourteenth, saying that their loans had been made to another company, which would tell Bender how much the Shipbuilding Company owed, but that it must be agreed ("it is agreed"), that the moneys due them under the old contract should be paid. Bender never consented to this, and on the twenty-first the plaintiffs signed a letter in the most sweeping terms releasing all rights which they might have in the old contract. Thereupon the new one was made and proceeded towards execution. Eventually, the Shipbuilding Company became bankrupt, and this action was commenced in July, 1927, nearly nine years after the new contract was made.

The complaint was in four counts, of which the first was originally laid upon a promise of the defendant "to abide by the terms" of an agreement between the plaintiffs and the Shipbuilding Company, under which the cheques were to be delivered to the plaintiffs. The substance of a contract was scarcely alleged; that is, that the defendant in consideration of the plaintiffs' advances to the company agreed to mail the cheques to them, but we may assume arguendo that it would have supported such proof. After the evidence was in, the judge allowed this count to be amended, and it is its amended form alone that is before us. In one article it lays a contract by which the defendant promised to mail the cheques to the plaintiffs, "upon condition that" they should finance the Shipbuilding Company. In the next it alleges an assignment by the Shipbuilding Company of the moneys coming due, of which the defendant had notice. While this mingles two different theories and leaves the count confused, we may treat it as alleging an assignment and notice to the defendant. The second and third counts were for fraud in inducing the plaintiffs to surrender their rights when the original contract was cancelled. The fourth was upon the defendant's promise at the time of cancellation to pay the plaintiffs the sums then remaining due, as a condition of the surrender of its assignment. The answer pleaded the statute of limitations and much else not material. It did not plead that the plaintiffs had surrendered any rights they might have in consideration of the cancellation of the contract and the execution of the substitute. At the close of the plaintiffs' case the judge directed a verdict on the ground that there was no evidence to submit to the jury, and it is from the judgment entered upon this that the appeal was taken.

The only promise, if any, which can be spelled out of the evidence, is Bender's, and Bender's authority to contract for the defendant was not shown. His duties were originally defined in an order of General Goethals, carefully describing them. Neither expressly, nor by implication, is there warrant for imputing to him any authority to contract, and in view of the defendant's public functions we should be loth to say that he had any. If any cause of action was proved, it was by assignment of the payments, an assignment of which Bender had notice, because he had consented to it, and in fact even proposed it. Undoubtedly the plaintiffs and the Shipbuilding Company originally wished to make an unlimited assignment of the right to the payments as they fell due, something which the contract expressly gave them the power to do, though the defendant might forbid it. When they found that Bender was willing only to mail the cheques to the plaintiffs, they were, however content to let the matter stand in that way. Talmadge on the stand expressly said that the eventual arrangements between them merely followed the lines of Bender's letter, and no jury could find otherwise. We are therefore to understand, whatever was their original purpose, that when the transaction became set, it was that the plaintiffs' security was to be delivery of cheques drawn to the order of the Shipbuilding Company, which that company impliedly agreed to indorse, so as to make them available. When received, the plaintiffs had a pledgee's lien upon these; such is the natural import of the transaction, and it appears to us that the evidence would have justified a finding by the jury that the company had intended to assign its rights in præsenti to that extent. Oral evidence of such an assignment was clearly admissible; the parties had not embodied their intent in a writing, and the notice to Bender was quite outside the assignment itself. Though the parties had accepted his suggestion as to their terms, his letter was not made the agreement, and certainly there was no warrant for supposing that it

was intended as a definitive memorial. A cause of action was proved, and, in the light of latter day notions about the interpretation of pleadings, we think that the allegations covered the proof.

Had the Shipbuilding Company assigned their right in toto, nobody can dispute that the plaintiffs might have sued at law, though the assignment would strictly have varied the defendant's obligation, compelling it to draw cheques to the plaintiffs' order and not as stipulated. So much change in performance is, however, permissible. Restatement of Contracts, § 152. In fact, the assignment varied performance less than this, leaving the form of the cheques as the contract prescribed, and assigning only the right to their delivery. However, since the company could demand no performance but the execution and delivery of the cheques, delivery of these to the plaintiffs was complete performance, and the obligee retained no right to demand anything further. The only occasion for resort to equity upon an assignment of a chose in action in præsenti is when it does not transfer all the obligee's right; and then because, unless all parties interested in the performance are present, the obligor cannot be protected from a second suit. Evans v. Durango, etc., Co., 80 F. 433, 438 (C. C. A. 8); Williston, § 442. When the obligee has parted with all interest in the performance, an action at law can adjust all the rights of the parties, and there is no reason why the assignee should not sue alone and in his own name.

To this there would be a possible exception in the case at bar, if the cheques were dishonored. Ordinarily of course a cheque is not payment, and that was the case here. Hence it might be argued that the company retained its right to enforce payment, in case the defendant dishonored the cheques, and that the assignment did not therefore divest it of all interest. Such an interpretation, while theoretically possible, appears to us to frustrate the obvious purpose of the parties. They meant to give the plaintiffs adequate security, and failed formally to assign the payments only because they supposed that Bender would not consent. But, the company having assigned its interest in the cheques as security, it would defeat the purpose to exclude the purely ancillary right to collect in case of their dishonor. Hence it seems reasonable to hold that the two passed together. If so, the company had no further interest in the payments, except as pledgor, and the plaintiffs might sue at law, as they did.

The cause of action so alleged arose when the cheques were diverted, and this was before August 19, 1918, the date of the last, so that the plea of the statute of limitations was a good one. To this the plaintiffs reply that they were kept in ignorance of the breach by the defendant's deceit, and that the statute should not run until they discovered the fraud. It is not clear that in New York in an action at law, sounding in contract, it is a good reply to the statute that the promisee has been fraudulently kept in ignorance of the breach. Section 48 (5) of the Civil Practice Act does indeed say that the statute shall not begin to run until the "discovery of the fraud," but that is limited to actions "to procure a judgment on the ground of fraud." An action in contract, like this, can scarcely be twisted so far. Moreover section 11 is express to the effect that, except as otherwise provided, the statute begins to run upon the "accruing of the right to relief." Whether the courts of New York have said, or will say, that the "right to relief" does not "accrue" until discovery of the fraud, we have not been able to find. That seems indeed a strong wrench to the language, and yet the contrary would at times result in monstrous injustice.

At any rate we need not pass on that question. It is enough under section 48 (5) that the victim of the fraud shall be put on notice of the practice upon him; he need not know the full details. Higgins v. Crouse, 147 N. Y. 411, 42 N. E. 6; Klotz v. Angle, 220 N. Y. 347, 360, 116 N. E. 24. Here there was more than enough to put the plaintiffs on notice. Bender's letter of August ninth, 1918, left no doubt that he had diverted some at least of the cheques; not only did he expressly say so, but he excused the diversion. Nor were the plaintiffs misled by the word "recent," since, as we have said, more than $530,000 had been diverted since June first. In their answering wire of August fourteenth they asked that the payments due them should be reserved from the cancellation and paid. This might perhaps have referred only to those already due and unpaid, but in the light of Bender's admission that he had already paid "recent" cheques to the company, it must be taken either as including these or abandoning any claim to them. In spite of their failure to get an assent to this proposal, and though they were uncovered by nearly $500,000, on the twenty-first they surrendered all their rights under the old contract, specifically mentioning any which might

arise under Bender's letter. How they can now assert that they did not know they had been wronged, we do not see. It may well be that they did not know the extent of the diversions; on the proof we must assume as much. But that makes no difference. A man may not let time slip by while he learns whether his wrongs are to be measured by tens, or hundreds, or thousands.

If, however, we are wrong in supposing that the assignment passed the assignor's right to recover in case the cheques were dishonored, the result is the same. The New York Civil Practice Act provides, section 278, that a defect of parties plaintiff, appearing on the face of the complaint, is waived if not taken before answer. If the count showed a partial assignment, the defect was waived, and the plaintiffs could proceed at law, where they were. The count hardly went so far, and the defendant could perhaps have insisted during the trial that the Shipbuilding Company should be joined. It did not do so, and under sections 192 and 193 we may assume that the action could have proceeded with the plaintiffs alone, saving any rights of the company. The Supreme Court in Delaware County v. Diebold Safe Co., 133 U. S. 473, 488, 10 S. Ct. 399, 33 L. Ed. 674, assumed that a somewhat similar provision of the Indiana Code left the action triable at law, and by implication that a suit in equity was not necessary. But if this be the proper view, it remained subject to the limitation of section 48, and was equally barred as though the assignment divested the assignor of all its rights.

If, on the other hand, it was essential for the plaintiffs to reframe the pleadings and transfer the cause to the equity side, bringing in the Shipbuilding Company, they suggested nothing of the sort, and do not do so even now. Nor indeed if they had, could they succeed. While the New York period of limitation for suits not otherwise specifically covered is ten years (section 53) it does not follow that it would apply here. We need not pass upon that question, beyond suggesting that the supposed suit might still be regarded as "an action upon a contract obligation" (section 48 (1), triable in equity only for procedural reasons. Even if section fifty-three does govern such a suit in New York, in a federal court sitting in equity it is not controlling. The Supreme Court has twice barred a stale claim, though the local statute had not run. Brown v. County of Buena Vista, 95 U. S. 157, 24 L. Ed. 422; Alsop v. Riker, 155 U. S. 448, 15 S. Ct. 162,

39 L. Ed. 218. This seems to us to be a case particularly adapted for such treatment; for, not only is it extremely stale, but it is brought in the face of a settlement made with adequate knowledge of the facts.

Indeed, we can see no reply to a plea of accord and satisfaction, had the answer contained it. While the plaintiffs' letter of August twenty-first, 1918, was not of itself a legal release, not being under seal, it was a good accord. It affected to release all claims arising under Bender's letter, in order that the old contract should be cancelled and the new made. That was a good consideration, probably a substantial prospective advantage to the plaintiffs; in any case quite enough to support the accord. When the consideration was given, that is, the new contract executed, it was a satisfaction, for satisfaction was not to be the performance of that contract, but its execution. We certainly would not strain to revive a claim so mildewed and abandoned.

Thus, though for somewhat different reasons from those of the District Judge, we think that there was nothing to leave to the jury, and that the direction of a verdict on the first count was right. In the light of what we have already said it is not necessary to discuss the others.

Judgment affirmed.

MANTON, Circuit Judge, concurs in the result.

### On Rehearing.

L. HAND, Circuit Judge.

The rehearing presents a question which was not originally submitted and which unfortunately escaped our attention at the time; that arising from the defendant's incorporation under the laws of the District of Columbia. From this the plaintiff argues that it is a foreign corporation, and as such unable to plead the statute of limitations of New York. Olcott v. Tioga R. R., 20 N. Y. 210, 75 Am. Dec. 393; Rathbun v. Northern Central Ry. Co., 50 N. Y. 656; Boardman v. Lake Shore, etc., R. R., 84 N. Y. 157. The relevant sections of the Civil Practice Act are numbers 13, 19 and 55, of which we may at once lay aside 13, since it does not appear that the plaintiff's assignors were non-residents of New York when the cause of action accrued in 1918. If that should be shown upon a new trial, that section will apply, for the cause of action arose outside New York. It is true that ordinarily a debtor must seek out his creditor and tender performance to him

where he is found (Williston, § 1812); but the contract here provided otherwise. Payments were to be made by cheques mailed in Washington to the address given by the contractor, and the act of mailing was performance. Palmer v. Phoenix Mut. L. Ins. Co., 84 N. Y. 63; Selman v. Dun, Fed. Cas. No. 12648. The defendant was bound to do no more, though, if the cheques were lost, the contractor perhaps had the same remedies as any one else who has lost a cheque once delivered. The breach was the failure to mail the cheques in Washington; it occurred there. Whether section 55 applies to a suit between non-residents upon a cause of action accruing within the state, we need not therefore consider. Garrison v. Newman, 222 App. Div. 498, 227 N. Y. S. 78, does not present that question, though the reasoning may imply that the section would cover such a case.

On the other hand, if the plaintiff's assignors turn out to have been residents, section nineteen was the relevant provision; that is, in case the defendant was "without the state" in 1918, for it had never designated a resident of the state on whom service might be made. Section 55 does not limit section 19 (National Surety Co. v. Ruffin, 242 N. Y. 413, 152 N. E. 246), and Comey v. United Surety Co., 217 N. Y. 268, 111 N. E. 832, Ann. Cas. 1917E, 424, does not seem to us broadly to make the statute run in favor of every foreign corporation which can be sued. It does not, however, follow that the defendant was "without the state." If it is a foreign corporation this is true, and that is determined under section 7 of the Civil Practice Act, when a question arises under another section of that statute. To be sure it is only a defining section, and section 19 does not use the phrase defined, "domestic corporations"; this has been imported into it by judicial construction. We may assume arguendo that, having so imported it, the state courts will construe it as though it had been actually written in. If so, and if the defendant is a corporation "created by or under the laws of the United States," and was "located in the state," it was a "domestic corporation," and was not "without the state." In that event section 19 did not apply, and the action was barred under section 48, for the reasons given in our original opinion.

 There is nothing in the record to disclose what, if any, were its activities in New York, and that alone is enough to decide this appeal, because we certainly may not take judicial notice of its doings. But we do not think that it was "located in the state." If this phrase is equivalent to "having its principal place of business" here, it certainly was not; of so much we can indeed take notice. If on the other hand it means that the corporation need only be "present" in such sense as to be subject to process in the state courts, it might well appear upon a new trial that it was "located" in New York. It seems to us that Rosenbaum v. Union Pac. Ry. Co., 2 How. Prac. (N. S.) (N. Y.) 45 (G. T. 1st Dept.), affirmed without opinion 100 N. Y. 617, concludes our choice in favor of the first alternative, though we are obliged somewhat to spell out the purport of the decision. The case arose upon a motion to vacate an attachment granted on the theory that the defendant was a foreign corporation. As it did business under an act of Congress (12 St. at L. p. 489), the courts could hardly have held that it was not "created by or under a law of the United States," though the plaintiff vigorously so argued; and the reasoning of the General Term was only that it was not "located" here, because Boston was its principal place of business, by which it meant that the meetings of its stockholders and directors were held, and its chief executive offices were fixed, in that city. An examination of the record shows that it also maintained executive offices in New York, where the coupons in suit were payable; that these were under the charge of an assistant treasurer and "other general executive officials" who lived here; and that it owned property in the state. These activities would have been enough, we should suppose, to subject it to process, had the statute not done so independently (12 St. at L. p. 490), and there seems to be little doubt that the Court of Appeals must have accepted the reasoning of the General Term. The only other case that bears upon the question is Gould v. Texas & Pac. Ry., 176 App. Div. 818, 163 N. Y. S. 479, for Maisch v. New York, 193 N. Y. 460, 86 N. E. 458, turned upon a statute which expressly made the principal place of business the test. In that case the defendant's main executive officers were in New York, and that was enough to defeat the attachment; the principal place of business was here. It is true that the court expressly declined to say that this was the only activity which would "locate" the corporation here, and indulged in some comment upon the possibility of a corporation's being in two places. Nevertheless, we cannot find in what was said a disposition to hold that a federal corporation is "located" wherever it may be sued. The section was probably chiefly intended to cover

national banks which are not "located" in more than one place.

While it is tempting, when one is dealing with a statute of limitations, to construe the words as including any activity which gives the plaintiff an opportunity to sue, we must have more in mind. The section is of general application, and has indeed been incorporated into the General Corporation Law (section 3 (10), Consol. Laws, c. 23); it is by no means clear that the state wished to treat as domestic all federal corporations which may do a continuous business here, even a substantial one. There is no reason why an exception should be made in their favor merely because they hold a federal charter; an entirely adequate motive was to cover such as were domestic in all senses except that they did not get their charters from the state. Thus, it becomes unnecessary for us to decide whether the defendant was "created by or under a law of the United States"; and unless the plaintiffs were non-residents when the cause of action accrued, the defendant may not plead section 48. This would no longer be true if it had had an officer here on whom process could be served, because of the amendment of 1928 to section 19 (Laws N. Y. 1928, c. 809); but, as this was passed after the action was brought, it cannot change the result.

So far as we can see, the plaintiff wins only a Pyrrhic victory. As we said in our original opinion, the evidence showed an accord and satisfaction, from which apparently he can in no way extricate himself. But as he stands upon the fact that nothing of the sort was pleaded, we cannot deny him his day in court on the issue. The District Court will allow the defendant to interpose the plea, but conceivably at the new trial facts may appear which will relieve the plaintiff from it. At any rate we can make no disposition of a matter which is not before us.

The judgment must be reversed and a new trial ordered.